**STATE of Alaska, DEPARTMENT OF LABOR, WAGE AND HOUR DIVISION, Appellant,**

v.

**UNIVERSITY OF ALASKA, Appellee.**

No. 5942.

Supreme Court of Alaska.

May 20, 1983.

Thomas Wickwire, Asst. Atty. Gen., Fairbanks, and Wilson L. Condon, Atty. Gen., Juneau, for appellant.

Peter J. Aschenbrenner, Aschenbrenner & O'Meara, Fairbanks, for appellee.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

CONNOR, Justice.

The State of Alaska appeals from a superior court judgment granting declaratory and injunctive relief against the Department of Labor, Wage and Hour Division [hereafter referred to as the "Department of Labor"]. The central issue is whether the superior court erred in declaring that the Department of Labor lacked subject matter jurisdiction to hear a purported wage claim brought against the University of Alaska. We find no error and affirm the judgment of the superior court.

The essential facts are not in dispute. In February, 1980, the state legislature enacted the State Pay Bill Act expressing its intent that the Board of Regents of the University of Alaska increase University employees' salaries "by approximately seven percent" for the 1979 calendar year (retroactively), and "by an average of an additional 10 percent" for 1980.[1] Ch. 3, § 35,

---

1. The pertinent provisions of the bill, read as follows:

"Sec. 35. EMPLOYEES OF THE UNIVERSITY OF ALASKA. In determining compensation for employees of the University of Alaska under AS 14.40.170(2), it is the intent of the legislature that the Board of Regents amend the salary schedules for employees of the university who are not covered by collective bargaining agreements

(1) to increase salaries by approximately seven percent, retroactive to January 1, 1979; and

(2) to increase salaries by an average of an additional 10 percent, effective January 1, 1980.

SLA 1980. The Board of Regents, in anticipation of this legislative action, had instructed the president of the University to "adjust certain [salary] schedules more closely to State employee schedules and provide for the award of merit increases in a small number of cases."[2] Upon the finding of the 1980 State Pay Bill Act, the President of the University, Jay Barton, directed the following action to be taken: (1) an across-the-board 7% increase in salary schedules was to be given to all University employees, retroactive to January 1, 1979; and (2) the additional monies available January 1, 1980, were to be used to "redress certain inequities in our present salary structure, partially fund geographic salary differentials, partially compensate for the impact of inflation, and reward merit where appropriate."

As part of the implementation of the second prong of this scheme, all faculty and staff members who were currently earning $24.00 an hour or more were subject to a special review ("red-circled") by the chancellors of the University and by the office of the president. Any salary increase beyond the 7% level was to be individually determined.

One of the employees whose position was "red-circled" was Thomas B. Gruenig, university counsel. As a result of his special review, Gruenig received his initial 7% increase but was denied any further pay increase, effective April 19, 1980.[3] On March 17, 1980, Gruenig gave notice of his intention to resign, effective June 30, 1980. On May 13, 1980, Gruenig filed a written protest against the president's review with the University Grievance Council in Fairbanks. Gruenig alleged that the president had acted arbitrarily and in a manner contrary to all applicable statutes and regulations.

> Sec. 36. This Act may not be applied to reduce the compensation of a person during his tenure in the office or position he holds on the effective date of this Act."
> Ch. 3, §§ 35–36, SLA 1980.

**2.** The Board of Regents, on January 23, 1980, had adopted the following statement of policy:
> "The Board of Regents as a matter of policy affirms its previous position that the University of Alaska employees receive wage and salary increases equivalent to those received by other State employees. Therefore, the Board of Regents directs the President of the University to administer wage and salary increases for non-covered University employees in accordance with the provisions of the pay bill as passed by the legislature and approved by the Governor. Policy effective January 25, 1980."

The minutes of the Board of Regents also reflect the following interpretation of the policy referred to above:
> "The Board in approving this policy understands that the President will administer it as follows: Salary increase monies to become available March 16, 1980 will be applied to all wage and salary schedules except for that portion determined by the President necessary to (1) adjust certain schedules more closely to State employee schedules and provide for the award of merit increases in a small number of cases sufficient to attract and retain staff of the highest quality, and (2) the salary of the President will be set by the Board of Regents."

**3.** On April 29, 1980, President Jay Barton sent a memorandum to the University of Alaska chancellors titled "Special Note on the 'Over 24's' Review." With respect to administrative and executive salaries, the memorandum states:
> "Administrative and executive salaries were all examined closely. Salary levels, providing for comparability of similar jobs were established. The executive level compensation chart which is attached shows the final result of placements on the Anchorage base rate of pay. You will notice that there is a definite pattern in the compensation of individuals with like duties and levels of responsibility. A number of individuals were red-circled at their 1979 rates to bring them into parity with their counterparts."

Specifically with regard to Gruenig, President Jay Barton later stated that the review had encompassed salary information not only from the State of Alaska but from throughout the United States, including various studies of faculties and administrators in other land grant colleges. According to Barton, by these comparisons, Gruenig was paid 40% above the median rate for university counsel, and was, by some $3,000.00 per year, the highest paid university counsel of the 145 employed by land grant colleges in the United States. Barton also pointed out that during this individual review, consideration was given to the facts that Gruenig's job responsibilities had been lessened in January 1980 and that Gruenig had chosen not to renew his employment contract on July 29, 1979, but merely to continue working under its general terms until further notice.

Gruenig further claimed that the president's action denied him due process and equal protection, and constituted an "impairment of contract" in violation of Article I, § 15 of the Alaska Constitution and Article I, § 10 of the United States Constitution. After investigation the grievance council recommended dismissal of the claim, and the president affirmed this recommendation.

Some time after his resignation, but prior to August 5, 1980, Gruenig contacted the Department of Labor, and assigned a "wage claim" to this agency. On August 5, 1980, the Department of Labor instituted a "wage claim" on Gruenig's behalf. The University contested the claim. The Department of Labor commenced an investigation and scheduled a hearing on the matter for December 3, 1980. Four University employees, including the president, received subpoenas to appear at the hearing. The University then filed suit in the superior court, seeking a temporary restraining order, preliminary injunction and permanent injunction to prevent the Department of Labor from hearing the wage claim. The University also sought a declaratory judgment that the Department of Labor did not have subject matter jurisdiction over Gruenig's claim.

On December 1, 1980, the superior court ordered a temporary stay of the Department of Labor hearing. On December 23, the court orally issued what it termed a preliminary injunction against further investigation of the wage claim by the Department of Labor. A week later, the University moved for summary judgment incorporating by reference the memoranda and sworn affidavits filed in the earlier proceedings. The Department of Labor opposed the motion. The superior court granted summary judgment declaring that the Department of Labor lacked subject matter jurisdiction over Gruenig's claim against the University. The Department of Labor was ordered not to prosecute the "wage claim," and the "wage claim" filed with the Department of Labor was ordered dismissed. This appeal followed.

This case presents the question of whether the superior court properly enjoined the Department of Labor from investigating, holding a hearing on, or further adjudicating the claim assigned to it by Gruenig. The question necessarily includes a two stage analysis: First, was the superior court correct in determining that the Department of Labor lacked jurisdiction over the claim of Gruenig? Second, if the Department of Labor lacked jurisdiction, was the superior court correct in issuing the injunction?

The nature and scope of the Department of Labor's jurisdiction with regard to wage claims is determined by the legislative authorizations of AS 23.05.010—.340. Under AS 23.05.060(4), the Department of Labor may institute court proceedings against an employer (at no cost to the employee) when the Department of Labor "is satisfied that the employer has failed to pay an employee an amount due by contract." The Department of Labor may take an assignment of a wage claim under AS 23.05.220.[4] After a determination that the claim is valid and enforceable, and that the claimant is entitled to its services, the Department of Labor may prosecute an action for the collec-

---

4. AS 23.05.220 provides:

"*Assignment of wage claims to department.* (a) The department may take an assignment of (1) a wage claim and an incidental expense account and an advance; (2) a mechanics or other lien of an employee; (3) a claim based on a 'stop order' for wages or on a bond for labor; for damages for misrepresentation of a condition of employment; against an employment agency or its bondsman; for unreturned bond money of an employee; for a penalty for nonpayment of wages; for the return of a worker's tools in the illegal possession of another person; and for vacation pay or severance pay.

(b) The department is not bound by any rule requiring the consent of the spouse of a married claimant, the filing of a lien for record before it is assigned, or prohibiting the assignment of a claim for penalty before the claim has been incurred or by any other technical rule with reference to the validity of an assignment.

(c) The department may not accept an assignment of a claim in excess of $5,000."

tion of the claim. AS 23.05.230.[5] If the employer disputes the claim, the employer must respond in writing to the claim and pay any wages conceded to be due. AS 23.05.180.[6] In investigating the claim the Department of Labor has the power to "issue subpoenas, administer oaths, and take testimony concerning any matter within its jurisdiction." AS 23.05.050. The Department of Labor also has the power to examine the books, accounts, records, and payroll of the employer. AS 23.05.100.[7] The employer is required to keep an accurate record "of the daily and weekly hours worked by each person, and of the wages paid each pay period to each person." AS 23.05.080. The Department of Labor may hold investigative hearings to determine whether a wage claim is "just and valid." AS 23.05.200.[8] If the employer does not settle the claim, the Department of Labor may refer the case to the attorney general for prosecution in the superior court. AS 23.05.210.

Neither the statutes (AS 23.05) nor the substantive regulations adopted under their authority (8 AAC 25.010–.030) define "wage claim." However, where a statute delegating power to an administrative agency does not expressly define the extent of that power, it may be implied from the general policy and purposes underlying the legislative enactment. *Kenai Peninsula Fisherman's Cooperative Association v. State,* 628 P.2d 897 (Alaska 1981).

The purpose of the Department of Labor is to "foster and promote the welfare of the wage earners of the state, improve their working conditions and advance their opportunities for profitable employment." AS 23.05.010. The above delineated statutory sections clearly promote that purpose by aiding an employee in the pursuit of a wage claim against an employer. Other sections provide further protection to the employee. The employer and employee

---

5. AS 23.05.230 provides:
   "*Prosecution of claims.* (a) The department may prosecute an action for the collection of a claim of a person whom it considers entitled to its services, and whom it considers to have a claim which is valid and enforceable.
   (b) The department may prosecute an action for the return of a worker's tools which are in the illegal possession of another person.
   (c) The department may join several claimants in one lien to the extent allowed by the lien laws and, in case of suit, join them in one cause of action. No bond is required from the department in connection with an action brought as assignee under AS 23.05.220 and 23.05.230."

6. AS 23.05.180 provides:
   "*Wages in dispute.* If the amount of wages due is in dispute, the employer shall give written notice to the employee of the amount of wages which he concedes to be due, and shall pay that amount, without condition, within the time set by this chapter. Acceptance by an employee of a payment made under this section does not constitute a release of the balance of his claim."

7. AS 23.05.100 provides:
   "*Inspections and examination of records.* The department may
   (1) enter a place of employment during regular hours of employment and in cooperation with the employer, or someone designated by him, collect facts and statistics relating to the employment of workers;

   (2) make inspections for the proper enforcement of all state labor laws;
   (3) for the purpose of examination, have access to and copy from any book, account, record, payroll, paper or document relating to the employment of workers."

8. AS 23.05.200 provides:
   "*Hearings on wage claims.* (a) The department may hold hearings to investigate a claim for wages. It may cooperate with an employee in the enforcement of a claim against his employer when it considers the claim just and valid.
   (b) The authorized representative of the department, in conducting a hearing under this chapter, may administer oaths and examine witnesses under oath, issue subpoenas to compel the attendance of witnesses, and the production of papers, books, accounts, records, payrolls, evidentiary documents, and may take depositions and affidavits in a proceeding before the department at the place most convenient to both employer and employee.
   (c) If a person fails to comply with a subpoena or a witness refuses to testify to a matter regarding which he may be lawfully interrogated, the judge of a competent court may, on application by the department, compel obedience by proceedings for contempt as in the case of disobedience of the requirements of a subpoena issued from the court or a refusal to testify before it."

must agree as to pay periods in the initial contract of employment. AS 23.05.140(a). The employer must pay all wages, salaries or other compensation due an employee within three working days of termination, regardless of the cause of termination. AS 23.05.140(b). If the employer fails to pay within three working days of termination, the employer is liable to pay the employee's regular wage, salary or other compensation [9] from the time of demand to the time of payment for up to 90 working days. AS 23.05.140(d). As additional protection for the employee, the employer must notify the employee in writing at the time the employee is hired of the rate of pay [10] and the day and place of payment. AS 23.05.160.

Construing the term "wage claim" in light of AS 23.05 as a whole, we find that the power to accept an assignment of and to investigate and prosecute a wage claim does not include the power to deal with the claim in this particular case. A "wage claim" contemplates an employee seeking agreed-upon or equitably owed compensa-tion for services which is unpaid and there-fore due.[11] The legislature intended the Department of Labor's authority to extend only to claims for wages owing under an express or implied contract. This authority does not extend to a claim that an employer unconstitutionally, illegally, arbitrarily and capriciously failed to increase an employee's salary. Gruenig does not seek to recover wages due him, but rather claims that he was wrongfully denied a reclassification and a salary increase. The superior court therefore correctly concluded that the De-partment of Labor could not prosecute the claim of Gruenig, although Gruenig could pursue any other remedy otherwise provid-ed by law.[12]

Additionally, we hold that the supe-rior court's grant of summary judgment and a permanent injunction against prose-cution of this claim by the Department of Labor was a proper exercise of its power to render a declaratory judgment under AS 22.10.020(b).[13] The superior court properly

9. "Regular wage, salary or other compensa-tion" is defined by regulation as:
"... that level of compensation paid to an employee for his services which was usual and regular for a daily, weekly, or monthly period of work, as the case may be; this 'regular' level is to be determined based on the employee's actual working situation and is not limited to a level of compensation based on a 'standard' eight-hour workday or 40-hour workweek where the employee's reg-ular and usual course of employment actually involved more or less hours of work for the relevant period; nothing in this paragraph requires that an employee have been hired on an hourly or weekly basis; he may have been paid by piece rate, salary, commission or other method of compensation agreed upon between the employer and employee."
8 AAC 25.030(4).

10. "Rate of pay" is defined by regulation as "... all renumeration for service from whatev-er source ... received or anticipated to be received by an individual in the course of his service that are a contractual condition of his employment." 8 AAC 25.030(3).

11. Examples of such valid assigned claims may be found in *Dresser Industries, Inc. v. Alaska Department of Labor*, 633 P.2d 998 (Alaska 1981) and *State v. Osborne*, 607 P.2d 369 (Alas-ka 1980).

12. The Department of Labor unnecessarily ar-gues that it is authorized to investigate wage claims of employees of the University despite the fact that the University is an instrumentali-ty of the State of Alaska. The Department of Labor's confusion as to the issue was apparent-ly caused by dictum in the oral ruling of the court at the preliminary injunction hearing, which was not included in the court's written findings. The University expressly does not contend that the Department of Labor has no jurisdiction over wage claims brought by em-ployees of the University, but rather that the Department of Labor lacked subject matter jur-isdiction over Gruenig's claim as it was not a "wage claim."

13. AS 22.10.020(b) provides:
"(b) In case of an actual controversy with-in the state, the superior court, upon the filing of an appropriate pleading, may declare the rights and legal relations of an interested party seeking the declaration, whether or not further relief is or could be sought. The declaration has the force and effect of a final judgment or decree and is reviewable as such. Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against an adverse party whose rights have been determined by the judg-ment."

exercised its discretion in providing judicial relief without requiring the University to exhaust its administrative remedies. The doctrine of exhaustion of administrative remedies is an expression of administrative autonomy and a rule of sound judicial administration. B. Schwartz, Administrative Law § 172, at 498 (1976). The purpose of the doctrine is to allow an administrative agency to perform functions within its area of special expertise, to develop a factual record and to exercise its discretion. By allowing an agency to conclude its evaluation, the courts may never have to intervene. *Aleknagik Natives, Ltd. v. Andrus*, 648 F.2d 496 (9th Cir.1980).

██ However, where, as here, the jurisdiction of the agency is questioned on persuasive grounds, there is an exception to the exhaustion requirement. Most state courts which have addressed the question have concluded that the doctrine of exhaustion does not apply to cases where agency jurisdiction is challenged.[14] Given the purposes of the exhaustion requirement in the usual case, we agree that this exception is a sound one. Obviously, a determination that an agency lacks jurisdiction spares the parties the trouble and expense of going through a useless hearing. Where an agency lacks jurisdiction there is no benefit to be gained through its special expertise, and pursuit of administrative remedies would be a futile and meaningless procedure. The burden on the University and the apparent doubt about the Department of Labor's jurisdiction justified the superior court's grant of judicial relief without requiring further administrative proceedings.

Therefore, the judgment of the superior court granting summary declaratory judgment, dismissing the claim filed with the Department of Labor, and enjoining the Department of Labor from prosecuting the claim of Thomas Gruenig is AFFIRMED.[15]

RABINOWITZ, Justice, dissenting, joined by MATTHEWS, Justice.

I disagree with the majority's conclusion that the Department of Labor was without jurisdiction because Gruenig's grievance did not involve a "wage claim" within the meaning of AS 23.05.220. Assuming arguendo that the majority is correct in concluding that the Department's jurisdiction is limited to wage disputes arising out of express or implied contracts, I am persuaded that Gruenig's claim involves contractual rights. Gruenig rejected a renewal contract whose terms included the following provision:

Any subsequent Cost of Living Allowances granted by the Legislature shall be applied according to Regents' policy and regulation, as applicable.

In so doing, Gruenig specifically stated that he nevertheless intended "to continue working under the general terms of [his] renewal contract until further notice." While the University never explicitly accepted this proposal, Gruenig did continue to work for the University until his resignation the following year. It is certainly arguable that the provision regarding cost of living allowances was incorporated into Gruenig's employment agreement, and thus that he was contractually entitled to receive further pay increases. Since it is a question of fact whether or not Gruenig's claim was based on his employment contract, summary judgment on the question of the Department's subject matter jurisdiction over this claim

14. *See, e.g., Univar Corp. v. City of Phoenix*, 122 Ariz. 220, 594 P.2d 86 (Ariz.1979); *Ogo Associates v. City of Torrance*, 37 Cal.App.3d 830, 112 Cal.Rptr. 761 (Cal.App.1974); *Ward v. Keenan*, 3 N.J. 298, 70 A.2d 77 (N.J.1949); *State v. Credit Bureau of Albuquerque, Inc.* 85 N.M. 521, 514 P.2d 40 (N.M.1973); *Walker Bank & Trust Co. v. Taylor*, 15 Utah 2d 234, 390 P.2d 592 (Utah 1964).

15. The Department of Labor also contends on appeal that the grant of the preliminary injunction on December 23, 1980, was in error because (1) there was no finding of irreparable harm to support it and (2) it was in effect a permanent injunction. Both of these points are moot in view of the fact that the preliminary injunction was replaced by a permanent injunction on the University's motion for summary judgment on January 23, 1981. *Barber v. Northern Heating Oil, Inc.*, 447 P.2d 72, 73 (Alaska 1968).

was improperly granted. Alaska R.Civ.P. 56(c).

I also disagree with the majority's conclusion that a "wage claim" cannot arise from a wrongful failure to grant a contractually or statutorily mandated increase in compensation. The majority reasons that

> Gruenig does not seek to recover wages due him, but rather claims that he was wrongfully denied a reclassification and a salary increase.

The majority therefore concludes that Gruenig was not asserting a valid "wage claim," since

> [a] "wage claim" contemplates an employee seeking agreed-upon or equitably owed compensation for services which is unpaid and therefore due.

I disagree with the implicit premise that an unpaid wage increase cannot constitute "wages due" and furnish the basis for a valid "wage claim." If the employment contract stipulates that wage increases are to take place at a fixed rate, and the employer refuses to raise the employee's salary in accordance with the contractual terms, the Department would clearly have jurisdiction to compel the employer to comply with the employment contract. For example, if the employment agreement required the employer to pay a claimant the minimum wage, and the legislature raised the minimum wage, the Department would have jurisdiction to require the employer to increase the claimant's salary if the employer refused to do so independently.

My conclusion that the Department clearly had authority under AS 23.05 to entertain and prosecute Gruenig's claim leads me to disagree with the majority's holding that "[t]he superior court properly exercised its discretion in providing judicial relief without requiring the University to exhaust its administrative remedies." In particular, I do not agree with the proposition that "the doctrine of exhaustion does not apply to cases where agency jurisdiction is challenged." Adopting Professor Davis' approach, I would consider an alleged jurisdictional defect as only one among several factors affecting the propriety of the invocation of the exhaustion requirement,[1] and would conclude that the University should have been required to exhaust its administrative remedies. The University would not suffer a significant hardship, financial or otherwise, were it required to await the Department's decision regarding the merits of Gruenig's claim.[2] Furthermore, a deter-

---

1. Professor Davis adduces three factors which should be considered by a court in ruling upon a contention that a party should be required to exhaust its administrative remedies:

> The key factors are three: extent of injury from pursuit of administrative remedy, degree of apparent clarity or doubt about administrative jurisdiction, and involvement of specialized administrative understanding in the question of jurisdiction. Unfortunately, each of these three key factors is a variable, and each often calls for a considerable amount of judgment for its proper appraisal.
>
> A workable standard probably should not go beyond a statement that each of these three factors should be weighed in determining whether or not a court should decide an issue of administrative jurisdiction without requiring exhaustion of administrative remedies. A neat word formula probably is not feasible. . . .
>
> When the administrative proceeding involves neither abnormal expense nor other irreparable harm, and when the issue of jurisdiction is either doubtful or dependent upon specialized understanding in the agency's field, requiring exhaustion is normally desira-

ble. When expense or other irreparable harm is great and the issue of jurisdiction is easy for the court to determine, exhaustion normally should not be required. Exhaustion problems are difficult when the three factors pull against each other.

3 K. Davis, Administrative Law Treatise, § 20.-03 at 69–70 (1958) (footnotes omitted). This three-factor test has been used successfully in the ninth circuit since 1964. *See S.E.C. v. G.C. George Securities, Inc.,* 637 F.2d 685, 688 n. 4 (9th Cir.1981); *Marshall v. Burlington Northern, Inc.,* 595 F.2d 511, 513 (9th Cir.1979); *Casey v. F.T.C.,* 578 F.2d 793, 796 (9th Cir.1978); *Marshall v. Able Contractors, Inc.,* 573 F.2d 1055, 1057 (9th Cir.), *cert. denied,* 439 U.S. 826, 99 S.Ct. 98, 58 L.Ed.2d 119 (1978); *Lone Star Cement Corp. v. F.T.C.,* 339 F.2d 505, 510 (9th Cir.1964); K. Davis, Administrative Law Treatise, § 20.19 at 296–97 (Supp.1982).

2. *See State of California, ex rel. Christianson v. F.T.C.,* 549 F.2d 1321 (9th Cir.), *cert. denied,* 434 U.S. 876, 98 S.Ct. 228, 54 L.Ed.2d 156 (1977), where the court applied Professor Davis' test and concluded that:

> Only a clear showing of irreparable injury from anticipated agency action will excuse

mination of whether it constitutes a "wage claim" within the meaning of AS 23.05.200 arguably requires a "specialized understanding in the agency's field."[3] Thus, because the jurisdictional question is doubtful and the University made no persuasive showing that it would suffer irreparable harm if the case were remanded to the Department, I would reverse the decision below and permit the Department to exercise its statutory authority to decide whether to prosecute Gruenig's claim.

the exhaustion of administrative remedies and permit judicial intervention in the agency process.

*Id.* at 1323 (citations omitted). The court vacated an injunction ordering the FTC to terminate cease-and-desist proceedings for lack of jurisdiction, holding that:

> litigation expenses, however substantial and nonrecoverable, which are normal incidents of participation in the agency process do not constitute irreparable injury.

*Id.* (citations omitted).

3. Davis, *supra* note 1, § 20.03 at 70 (1958). The "specialized understanding" criterion is not extremely important in light of the statutory mandate involved in this case. The Department is not given jurisdiction under AS 23.05 to adjudicate the merits of Gruenig's claim, but rather is merely authorized to decide whether or not to prosecute the action. A court would ultimately adjudicate the claim in the first instance even if exhaustion were required.